Samantha Romero (Cal. Bar No. 344476*)
Ethan Blevins (Mont. Bar No. 37415893)
Caleb R. Trotter (Cal. Bar No. 305195*)
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
SRomero@pacificlegal.org
EBlevins@pacificlegal.org
CTrotter@pacificlegal.org
Telephone: (916) 419-7111
* *Pro hac vice*

Matthew G. Monforton (Mont. Bar No. 5245)
MONFORTON LAW OFFICES, PLLC
32 Kelly Court
Bozeman, Montana 59718
matthewmonforton@yahoo.com
Telephone: (406) 570-2949

*Attorneys for Plaintiff Do No Harm*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

|  |  |
|---|---|
| DO NO HARM, <br><br> Plaintiff, <br><br> v. <br><br> GREGORY GIANFORTE, in his official capacity as Governor of the State of Montana, <br><br> Defendant. | Case No.: 6:24-cv-00024-BMM-KLD <br><br><br> PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT |

## Introduction

The Fourteenth Amendment to the United States Constitution commands that no state shall deny any person equal protection of the laws. In contravention of that command, the State of Montana directs the Governor and other appointing authorities to discriminate against candidates for all state boards and commissions based on their gender[1] and race. Mont. Code § 2-15-108(1). Because of the discrimination mandated by state law, Plaintiff Do No Harm's members are subjected to impermissible barriers when seeking to serve on the Board of Medical Examiners. This discriminatory treatment on account of their gender and race violates the Equal Protection Clause of the Fourteenth Amendment. *See* First Am. Compl. (Doc. 25) ¶¶ 38–51.

To his credit, Defendant Governor Gianforte acknowledges the impermissibility of using the gender and race of candidates when making appointments to public boards. Mot. to Dismiss (Doc. 27) 2. Accordingly, the Governor refuses to defend the unconstitutional mandate written into the text of section 2-15-108(1). Instead, he makes two arguments

---

[1] Although equal protection jurisprudence often uses the terms "gender" and "sex" interchangeably, Do No Harm uses "gender" to match the language in Mont. Code § 2-15-108.

disputing the Court's jurisdiction to hear a challenge to this facially discriminatory law. First, he argues that Do No Harm lacks Article III standing. *See generally* Mot. to Dismiss 6–9. Second, he argues that this case is not ripe because the statute is merely "aspirational" and does not bind him. *Id.* at 9–10.

But surely at the motion to dismiss stage the Governor's promise to *not* follow the text of the statute is insufficient to deprive this Court of jurisdiction. The statute insists that a thumb be placed on the scale in favor of race and gender. *See* Mont. Code § 2-15-108(1) (Governor "*shall take positive action* to attain gender balance and proportional representation of minorities resident in Montana to the greatest extent possible" when making appointments) (emphasis added). As pled in the First Amended Complaint, this statutory command to treat individuals differently injures Do No Harm's members. First Am. Compl. 38. Further, because there are regular openings on the Board of Medical Examiners for which Do No Harm's members are otherwise eligible, this claim is plainly ripe. Do No Harm has satisfied its pleading requirement that the mandate is unconstitutional, and the Motion to Dismiss should be denied.

## Background

In 1989, the Montana Legislature passed House Joint Resolution No. 28, "urging that all appointive boards, commissions, committees, and councils of the state be gender-balanced." First Am. Compl. ¶¶ 13–14. However, during the 52nd Legislature's Regular Session, legislators viewed Resolution No. 28 as insufficient. *See id.* ¶¶ 15–16.

In considering H.B. 424, lawmakers and advocates acknowledged that the bill created a mandate for gender balancing and racial proportionality applicable to individual boards necessary to achieve lawmakers' goal of eliminating "bias" in public board appointments. First Am. Compl. ¶¶ 16–18. *See also* Hearing on House Bill 424 Before the S. Comm. on State Admin, 1991 Leg., 52nd Sess. 13–14 (Mont. 1991) (Exhibit 2, stating "mandating is warranted because . . . the resolution is not working."); *id.* at 16 (Exhibit 4, citing examples of all-male boards as evidence of the need for gender balancing) attached as Exhibit A to this Opposition.[2] H.B. 424 was enacted in 1991 and became Mont. Code § 2-15-108.

---

[2] The Governor's only support for his aggregate theory of board appointments, *see* Mot. to Dismiss 3–4, is that governors past and present

Relevant here, section 2-15-108(1) requires that "all appointing authorities of all appointive boards, commissions, committees, and councils of state government *shall take positive action* to attain gender balance and proportional representation of minorities resident in Montana to the greatest extent possible" when making appointments (emphasis added). There is no evidence that this language is or was ever intended to be aspirational or hortatory. The lack of gender balance greatly concerned the Legislature, it drafted a statute that unequivocally mandates the consideration of race and gender in appointments, and the then-governor signed these mandates into law. *See generally* Hearing on H.B. 424.

---

have complied with the reporting requirement of Mont. Code § 2-15-108(3) by aggregating data on gender and race. That governors have chosen to report aggregate data rather than board-specific data does not compel interpreting the mandate of section 2-15-108(1) as an aggregate mandate. Indeed, such an interpretation ignores that appointments are made to individual boards and that avoiding single-sex boards was the primary purpose for the law. *Compare* Plaintiff's Exhibit A (Hearing on H.B. 424, Ex. 4), *with* Mot. to Dismiss 4 n.2. The Governor's concern about odd-numbered boards impeding efforts to gender balance an individual board is addressed by section 2-15-108(1)'s requiring the Governor to comply with the mandates only "to the greatest extent possible." In other words, should true 50-50 gender balance be impossible on a 9-member board, for example, a violation of the statute will not be found if the board is split 5-4 male to female.

Montana's Board of Medical Examiners is one such board subject to the mandate of section 2-15-108. The statute commands the Governor to appoint Board members who satisfy its gender and racial mandate. *See* Mont. Code §§ 2-15-1731, 37-1-123; *see also* First Am. Compl. ¶¶ 22–23. Two doctor-of-medicine seats opened in September of 2023, and the Governor did not fill those vacancies until April 3, 2024—three weeks after Do No Harm filed its initial complaint in this case. *Id*. ¶ 26. The next scheduled opening for a doctor-of-medicine seat is in September of 2024, with another doctor-of-medicine seat opening in September of each subsequent year. *Id*. ¶ 27. The seat for a doctor of osteopathy will open in September of 2026. *Id*. ¶ 28.

Do No Harm brings this suit, as part of its mission to eliminate discrimination in healthcare, on behalf of Members A, B, C, and D. First Am. Compl. ¶ 4. Members A, B, C, and D are able and ready to compete for appointment on the Board. However, the discriminatory mandates written into section 2-15-108(1) disadvantage them on the basis of their race and gender.

## Standard of Review

On a motion to dismiss under Federal Rule of Civil Procedure 12(b), this Court must accept all material allegations in the complaint as true and render them "in favor of the complaining party." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1100 (9th Cir. 2024). The general allegations are presumed to "embrace those specific facts that are necessary to support the claim." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## Argument

## This Case Presents a Justiciable Case or Controversy

### I.   Do No Harm Has Standing

Associational standing is established where: (1) one or more of [an association's] members would have standing to sue in their own right; (2) the interests [the association] seeks to protect are relevant to the organization's purpose; and (3) the individual members' participation is not required. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Governor disputes only the first of these requirements: whether Do No Harm's members would have standing in their own right. *See* Mot. to Dismiss 6. Because Do No Harm's members

7

would have standing to sue in their own right, Do No Harm has Article III standing. *Cal. Rest. Ass'n*, 89 F.4th at 1099.

### A.    Denial of Equal Treatment Constitutes an Injury in Fact

When the government imposes a barrier making it "more difficult for members of one group to obtain a benefit than it is for members of another group," the "denial of equal treatment resulting from the imposition of the barrier" constitutes an injury in fact. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). And while there is no right to be considered for service on a public board, "members … do have a federal constitutional right to be considered for public service *without the burden* of invidiously discriminatory disqualifications." *Turner v. Fouche*, 396 U.S. 346, 362 (1970) (emphasis added). Individuals are not required to have applied to maintain a claim for prospective relief, however, an equal protection plaintiff must demonstrate that she is "able and ready," to apply. *See Gratz v. Bollinger*, 539 U.S. 244, 260–62 (2003) (holding that whether a plaintiff "actually applied" was not relevant to her standing to seek relief).

8

The First Amended Complaint sufficiently alleges that section 2-15-108(1) imposes a barrier to equal treatment. *See, e.g.*, First Am. Compl. ¶¶ 1, 15. In *Ne. Fla. Chapter,* the City of Jacksonville enacted an ordinance that created a "set aside" requirement preferencing racial minorities for city contracts. 508 U.S. at 658. The Supreme Court held that the ordinance denied non-minorities the opportunity to compete on equal footing, causing them to suffer an injury in fact. *Id*. at 666. Here, too, Do No Harm's members have a right to be considered for the Board of Medical Examiners without being burdened by the "invidiously discriminatory disqualification[]" that Mont. Code § 2-15-108(1) creates. *Turner*, 396 U.S. at 362. The statute mandates that the Governor "shall take positive action to attain gender balance and proportional representation of minorities" when making appointments to state boards. Mont. Code § 2-15-108(1). As alleged, section 2-15-108(1) thus injures Do No Harm's members by preventing them from being considered on equal footing with other potential Board candidates on account of gender and race. First Am. Compl. ¶¶ 31–34, 36.

Rather than contest that section 2-15-108(1) creates a gender- and race-based barrier for Do No Harm's members, the Governor highlights

9

that the members have not applied for a seat on the Board of Medical Examiners. Mot. to Dismiss 6–7. But applying for a seat on the Board is not a prerequisite for Article III standing when discriminatory classifications prevent applicants from being considered on equal footing with other candidates.[3] *See Ne. Fla. Chapter,* 508 U.S. at 667–68; *Gratz,* 539 U.S. at 260–62. Do No Harm properly alleges that its members are "able and ready" to serve on the Board. First Am. Compl. ¶¶ 8–11 (all members are "qualified, ready, willing, and able" to serve).

For example, a doctor-of-medicine seat opens on the Board every September. *Id*. at ¶ 27. Do No Harm Members B and C are eligible for the next opening in September 2024 under all unchallenged criteria, *see* Mont. Code §§ 2-15-1731, 37-1-123, but are disadvantaged due only to the race-based mandate of section 2-15-108(1). First Am. Compl. ¶¶ 9–10, 33. For the doctor-of-osteopathy seat that will open in 2026, Member D will likewise be disadvantaged due only to her gender and race. First Am. Compl. ¶¶ 11, 28, 31, 33. And while Member A is currently ineligible for

---

[3] The Governor appears to recognize as much but relies on inapplicable authority from the employment discrimination context to suggest that Do No Harm must allege that applying for the Board would be "futile." *See* Mot. to Dismiss 6 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365–66 (1977)).

a doctor-of-medicine seat due to the Governor's appointment of a physician from the same county as Member A, Mot. to Dismiss Ex. A (Doc. 27-1); First Am. Compl. ¶ 8; Mont. Code § 2-15-1731(2)(a), she will be disadvantaged when that seat next opens in 2027 on the basis of her gender and race. Compl. (Doc. 1) ¶¶ 26–28. Do No Harm's allegations are sufficient to establish an injury in fact.[4] *See Gratz*, 539 U.S. at 260-62. *See also Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1185–86 (9th Cir. 2012) (distinguishing that the "able and ready" standard applies to prospective, not retrospective, relief).

## B.   The Governor's Interpretation of Section 2-15-108(1) as "Aspirational" Does Not Undermine Traceability

When a statute denies a plaintiff the opportunity to compete on equal footing, that harm is "injury in fact *caused* by the challenged statute." *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 707 (9th Cir. 1997)

---

[4] To the extent that the Governor is confused whether males or females would be required to be appointed to future openings under section 2-15-108(1), *see* Mot. to Dismiss 6–7, the confusion is the result of the Governor's aggregate theory of the statute's application, *see id*. at 3–4. Do No Harm's allegations of alternative gender- and race-based mandates under section 2-15-108(1) simply show that under both a plain reading of section 2-15-108(1) and the Governor's aggregate theory of the mandates, Do No Harm's members would suffer injury based on gender and race. *See* First Am. Compl. ¶¶ 31–34.

(emphasis added). *See also Ne. Fla. Chapter*, 508 U.S. at 666 n.5 ("It follows from our definition of 'injury in fact' that petitioner has sufficiently alleged [] that the city's ordinance is the 'cause' of its injury[.]"). Moreover, to cause injury in an equal protection context, a law need not "require" unconstitutional preferences to cause an injury in fact; the relevant question is if it "authorizes or encourages them." *Bras v. Cal. Pub. Utilities Comm'n*, 59 F.3d 869, 875 (9th Cir. 1995) (citing *Ne. Fla. Chapter*, 508 U.S. at 662).

In *Monterey Mech. Co.,* a state statute required the government to treat construction bids unequally based on race and sex, thus unconstitutionally disadvantaging the Monterey Mechanical Company. 125 F.3d at 704. The Ninth Circuit held that the injury in fact was the "discriminatory context established by statute" and that it was "caused by the challenged statute." *Id.* at 707.

The Governor provides assurances that he interprets the race and gender requirements of section 2-15-108(1) as "aspirational," Mot. to Dismiss 2, 4, 8, despite the mandatory language of the statute, *see* Mont. Code § 2-15-108(1) (governor "shall take positive action"). But the Governor's assurance of his interpretation when making appointments

12

does not remove the discriminatory context established by the challenged statute. *Monterey Mech. Co.*, 125 F.3d at 707. At an absolute bare minimum, it "authorizes or encourages" unconstitutional consideration of race and gender and that was sufficient for the Ninth Circuit in *Bras*. 59 F.3d at 875.

Relatedly, the Governor's interpretation of section 2-15-108(1) as "aspirational"[5] admits that the statute serves to "encourage" preferential consideration based on gender and race, which is alone sufficient to establish the necessary connection between the injury in this case and the Governor's enforcement of section 2-15-108. After all, even if the Legislature's mandate were simply that the Governor *aspire* to achieve race and gender balance, that too would put a thumb on the scales in violation of the Equal Protection Clause. *See Bras,* 59 F.3d at 875.

---

[5] There is no justification for the Governor's interpretation of section 2-15-108(1), which directs race proportionality and gender balancing, as aspirational, while holding the reporting requirement in section 2-15-108(3) as actually mandatory. *See* Mot. to Dismiss 3, 9. Nothing in the text or context of the statute states, nor even suggests, that one subsection is aspirational while the other subsection is mandatory.

### C.  Injunctive and Declaratory Relief Would Redress the Burdens of Section 2-15-108(1)

It is "likely, as opposed to merely speculative, that [Do No Harm's] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. Just as "a judicial decree directing the [government] to discontinue its [race and gender qualifications] would 'redress' the injury" in *Ne. Fla. Chapter*, 508 U.S. at 666 n.5, the same is true here.

Do No Harm seeks: (1) a permanent injunction forbidding the enforcement of gender and racial mandates of Mont. Code § 2-15-108(1); and (2) a declaration that the use of those mandates—aspirational or not—are unconstitutional. First Am. Compl., Request for Relief. Do No Harm does not seek to compel specific appointments or to prohibit the Governor from making appointments. Rather, Do No Harm seeks to ensure that the Governor does not use the gender or race of candidates when considering candidates for appointment to the Board. Do No Harm's remedies would thus redress the injury of being forced to contend with the challenged gender and race mandates and resulting barrier to equal treatment they impose.

The Governor counters that Do No Harm's remedies "would change nothing for the Governor." Mot to Dismiss 9. But as noted above, even if

section 2-15-108(1) is merely "aspirational," that encouragement alone injures Do No Harm's Members. *See Bras*, 59 F.3d at 875. Declaratory and injunctive relief establishing that the "aspirational" encouragement for gender balance and racial proportionality in appointments to the Board from section 2-15-108(1) is unconstitutional would remedy Do No Harm's injury. That is also true if the Court finds that the statute is mandatory and not merely aspirational. In either scenario, declaratory and injunctive relief from the mandate would necessarily remedy Do No Harm's injury. Do No Harm has standing.

## II.    Do No Harm's Claim Is Ripe

"The constitutional component of ripeness overlaps with the 'injury in fact' analysis for Article III standing." *Ass'n of Irritated Residents v. U.S. Env't Prot. Agency*, 10 F.4th 937, 944 (9th Cir. 2021) (quoting *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010). Thus, "the inquiry is largely the same: whether the issues presented are 'definite and concrete, not hypothetical or abstract.'" *Id*.

The Governor's ripeness argument turns on an errant characterization of Do No Harm's members' injuries. *See* Mot. to Dismiss 10. As discussed above, this case does not present a hypothetical or

abstract injury. Despite the Governor's refusal to comply with the mandates of section 2-15-108(1), the mandates remain applicable to the Governor and all future governors.[6] For each opening on the Board of Medical Examiners that Do No Harm's members are eligible under criteria not challenged in this case, *see* Mont. Code §§ 2-15-1731, 37-1-123, the members must therefore still contend with section 2-15-108(1)'s gender- and race-based barriers.

When the original Complaint in this case was filed, there were two openings for doctors-of-medicine on the Board. Compl. ¶ 22. At that time, Do No Harm Member A was eligible for either seat under all criteria except the gender and race mandates. *Id*. at ¶¶ 26–28. With the

---

[6] The Governor admits that a future governor may depart from the "aspirational" interpretation of the statute. Mot. to Dismiss 10. The Montana Constitution imposes term limits on the office. Mont. Const. art. IV, § 8(1)(a). This ensures that a new governor will be elected by 2028 at the latest. Indeed, a new governor might be elected later this year. The next governor will be authorized by the statute, as Governor Gianforte is now, to engage in unconstitutional discrimination. However, an injury that is years in the future does not undermine ripeness. *See New York v. United States*, 505 U.S. 144, 175 (1992); *see also Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018) ("[i]t is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged provision will be invoked") (quoting *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154–55 (9th Cir. 2000).

Governor's appointments to those seats on April 3, 2024—three weeks after the original Complaint was filed—Member A will again be eligible for the Board in 2027 because she lives in the same county as one of the recent appointees. *See* Mot. to Dismiss Ex. A; First Am. Compl. ¶ 8; Mont. Code § 2-15-1731(2)(a).

The next scheduled opening for a doctor-of-medicine seat is in September of 2024, with another doctor-of-medicine seat opening in September of each subsequent year. First Am. Compl. ¶ 27. If not for section 2-15-108(1), Do No Harm Members B and C are eligible for at least the September 2024 opening. *Id.* at ¶¶ 9-10. However, because only one of the 12 seats on the Board is currently held by a member of a minority group, Members B and C will not be eligible for the 2024 opening. *Id.* at ¶¶ 9–10, 33.

Even under the Governor's erroneous aggregate theory of interpreting section 2-15-108(1), *see* Mot. to Dismiss 3–4, Members B and C would still be disadvantaged for upcoming openings. Under that theory, the Governor is not to look at the composition of individual boards when making appointments, but the overall gender- and race-based makeup of all individuals serving on all state boards in total. As alleged

in the First Amended Complaint—and confirmed by the Governor, *see* Mot. to Dismiss Ex. C, at 7 (Doc. 27-3)—there is a sizeable imbalance in favor of non-minorities and men across all state boards. First Am. Compl. ¶¶ 32–33. That means that the Governor is directed/encouraged to appoint females and members of racial minority groups to all state board openings until gender balance and racial proportionality is reached across all state boards in the aggregate. Members B and C would thus be severely disadvantaged for the 2024 opening on the Board and likely many future openings.

Member D—a doctor of osteopathy—will face unequal treatment on account of her gender and race as a potential candidate for the doctor-of-osteopathy seat in September of 2026. *Id*. at ¶¶ 11, 28, 31, 33. And as with Members B and C, even under the Governor's aggregate theory, Member D will be ineligible for the Board in 2026 based on her race. *Id*. at ¶¶ 11, 34. Do No Harm's claim that section 2-15-108(1) poses impermissible barriers for its members based on gender and race is therefore ripe now and will be ripe on a continuous basis for the near future.

## Conclusion

For the foregoing reasons, this Court should deny the Governor's Motion to Dismiss.

DATED: June 28, 2024.                    Respectfully submitted,

                                         /s/ *Samantha Romero*
                                         Samantha Romero
                                         Cal. Bar. No. 344476*
                                         Ethan Blevins
                                         Mont. Bar No. 37415893
                                         Caleb R. Trotter
                                         Cal. Bar No. 305195*
                                         PACIFIC LEGAL FOUNDATION
                                         555 Capitol Mall, Suite 1290
                                         Sacramento, CA 95814
                                         SRomero@pacificlegal.org
                                         EBlevins@pacificlegal.org
                                         CTrotter@pacificlegal.org
                                         Telephone: (916) 419-7111
                                         * *Pro hac vice*

                                         /s/ *Matthew G. Monforton*
                                         Matthew G. Monforton
                                         Mont. Bar No. 5245
                                         MONFORTON LAW OFFICES, PLLC
                                         32 Kelly Court
                                         Bozeman, Montana 59718
                                         matthewmonforton@yahoo.com
                                         Telephone: (406) 570-2949

                                         *Attorneys for Plaintiff Do No Harm*

## Certificate of Service

I hereby certify that on June 28, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notice of such filing to counsel of record who are registered with CM/ECF.

Dated: June 28, 2024.                    Respectfully submitted,

/s/ *Samantha Romero*
Samantha Romero
Cal. Bar No. 344476*
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
SRomero@pacificlegal.org
Telephone: (916) 419-7111
* *Pro hac vice*

/s/ *Matthew G. Monforton*
Matthew G. Monforton
Mont. Bar No. 5245
MONFORTON LAW OFFICES, PLLC
32 Kelly Court
Bozeman, Montana 59718
matthewmonforton@yahoo.com
Telephone: (406) 570-2949

# EXHIBIT A

MONTANA

P.O. Box 1099

SENATE STATE ADMIN.

EXHIBIT NO. 2

DATE 3-6-91

BILL NO. HB 424

HB 424
Sponsor: Jessica Stickney
Kate Cholewa, MWL

Women make up over half of the Montana population, half of the Montana taxpayers, yet represent only one third of the governor appointees. The 51st Legislature passed HJR 28 which urged gender-balancing governor appointments. But clearly, HJR 28 has not resulted in the governmental appointments process adequately addressing the goal of equal representation of women in government. That is why at this time we urge you pass HB 424.

When public policies reflect the perspectives of less than 50% of the population, important needs and values of the society go unaddressed. Women and minorities identify different priorities, perspectives, problems, and solutions. They take into consideration factors that may go unnoticed by a board consisting exclusively of white men. The lack of representation of women and minorities can result in failed policies, which reveal themselves as other societal ills, such as the disproportionate number of women, children, and minorities living in poverty. If public policy was serving all people equally, the percentage of the have-nots would not be crowded as it is with minorities and women.

Because boards and commissions serve as stepping stones in governmental services, boards balanced for gender and race can lead to better policy issuing from the legislature, as well as the boards. Appointees gain experience, knowledge, exposure, and the political and personal connections necessary to further their public leadership careers. Access to these positions is access to officeholding. A study by the Center for the American Woman and Politics proves this especially true for women. According to the study, 55% of elected women legislators have held one or more appointive governmental positions. This is true only for about 25% of elected men legislators. Thus, appointive positions cultivate female leadership at other levels of government.

Women and minority appointees and officeholders also serve as role models which, in turn, cultivates future leaders. We tell children they can grow up to be whatever they want, but children are not fooled by rhetoric. Children model their ambitions after persons, not platitudes. Equal opportunity begins with the equal opportunity to aspire.

We needn't cultivate role models at the expense of expertise. Montana possesses a generous pool of talented women and minorities. Many of them possess the traditional qualifications for a given board. However, in balancing our boards we also are awarded with the opportunity to recognize that "qualified" may include experiences previously unrecognized, valid experience which often may be unique to women or minorities. This previously discounted experience can bring a broadened perspective to our public policies. To reach these both traditionally and non-traditionally qualified individuals,

MONTANA

P.O. Box 1099                                                                      7917

the governor may need to more effectively recruit, perhaps
requesting aid from various organizations.  Far from there being
a shortage of qualified women and minorities, women and
minorities represent a virtually untapped resource.

Although HJR 28 urged gender-balancing to address the
foresaid concerns, mandating is warranted because, simply put,
the resolution is not working.  50% is about as objective as a
goal can be.  Yet, when it comes to gender equity, our
conditioning can interfere with the most basic of computations.
Writer-researcher Dale Spender did a study wherein she taped
conversations between women and men, and then asked them
afterward what percent of the conversation they believed they
had.  In every case, both men and women believed the woman to
hold "her share" of the air time whenever she held 8% - 38% of
it.  The statistics were even worse for other forms of air time,
such as book reviews and classroom reading material.  This
reveals that as a result of our conditioning, our logic is able
to defy mathematics when it comes to equal representation of
women.  Left to our instinctive sense of "fairness", we will be
unfair.   Our traditional sense of what is women's fair share is
less than what her numbers indicate.  We must mandate equity if
we are ever to witness equity.  Dale Spender said that it is
difficult for a woman to get 50% of air time because in order to
get it she must break every rule in the book.  It feels unfair,
rude, and objectionably overbearing.

We're going to have to get over that.  And I believe we can.
We have faith that our elected governors want the best for all
Montanans.  This mandate will help our governors produce
equitable public policies.  Yes, our governor is doing a better
job than his predecessors, but HB 424 calls for more than
improvement.  It calls for equality.  HB 424 is not directed at
our present governor, but serves as a guideline for all our
governors, present and future.

SENATE STATE ADMIN.
EXHIBIT NO. 7
DATE 3-6-91
BILL NO. HB434

TESTIMONY PRESENTED TO THE
SENATE STATE ADMINISTRATION COMMITTEE

March 6, 1991

Chairwoman Vaughn, Members of the Committee:

My name is Lynda Saul.  I represent the Interdepartmental
Coordinating Committee for Women, known as ICCW.  ICCW was
established in 1977.  Our main purpose is to promote the full
participation of women at all levels of state government.

House Bill 424 will allow women to more fully participate at all
levels of state government by providing equal representation on
each appointive Board, Commission, Committee and Council of the
state.

Examples of current imbalances on these Boards as of December 31,
1990 are:

|                                    | Men | Women |
| ---------------------------------- | --- | ----- |
| Board of Housing                   | 7   | 0     |
| Board of Investments               | 8   | 0     |
| Judicial Nomination Commission     | 6   | 0     |
| Prison Branch Advisory Council     | 6   | 0     |
| Reserved Water Rights Compact Commission | 9 | 0 |
| Data Processing Advisory Council   | 20  | 2     |

However, the percent of women in proportion to men has increased
by nearly 7 percent under the current administration.  Governor
Stephens has appointed women to some key positions, such as: the
first woman ever on the Fish and Game Commission; the first woman
chair of the Board of Natural Resources and Conservation; a woman
as Coordinator of Indian Affairs and a member of the Board of
Pardons; three women as judges at the district court and Supreme
Court level; and two women in Cabinet level positions.

House Bill 424 would ensure a commitment to gender balance from
one administration to the next.  This bill is vital to assuring
full participation of all Montana citizens in state affairs.

ICCW supports House Bill 424 and urges you to vote in favor of
this Bill.